Ruffin, C. J.
 

 James H. Martin was a wealthy planter of Anson county, who made his will and a codicil to it, in which he appointed the plaintiff, a son-in-law, his executor, and the defendant, his widow, his ■ executrix, and then the testator died in July, 1836. Both the plaintiff and the defendant took probate of the will; but the plantations were chiefly managed through the latter part of 1836, and during the years 1837 and 1838, by the plaintiff, who received in the proceeds of crops, $*c. the sum of $16,442 65. Dissensions having then arisen between the plaintiff and the defendant, about the management of the estate and the administration of the assets, the plaintiff filed this bill, praying, for reasons set. out in it, for the appointment of a receiver and for a settlement of his accounts, as executor, and also for a settlement of that of the defendant, as executrix. By orders made at different times, receivers were appointed, until, finally, the management of the estates was, by consent, placed in the hands of Mr.
 
 *563
 
 Parsons, a second husband of the original defendant, Mrs. Martin. It was then referred to commissioners to audit and report the account of the administration of the plaintiff; arid to the report made, the defendants, Parsons and wife, have excepted.
 

 The first exception is to a credit allowed to the plaintiff, of $143 97, (with interest thereon) which the plaintiff received for certain cotton made by the negroes of the testator in the year 1836, and paid by him to the negroes. The facts respecting this item, as reported, are these. The testator, who was a considerable slaveholder, had been for many years in the habit of allowing his negroes to make small crops of cotton and other things, in patches of their own and for their own use. He did not, however, permit them to sell the cotton themselves, but required them, as they picked it out, to- bring it to his gin ; and the testator had it ginned and carried to market and sold with his own, and then, after deducting a due proportion of the expenses, the testator paid to the negroes the cotton made by them, to enable them to purchase small articles of comfort for themselves and their families. In the year 1836, the testator’s slaves had, by his permission, planted and cultivated their patches of cotton on his land : in autumn, they gathered it and delivered it to the plaintiff at the gin, to be prepared and sold for them by him, when he should sell' that belonging to the estate. It was accordingly sent to market and all was sold together, and entered by the commission merchants in the accounts of the estate ; so that the plaintiff in his own account as executor, gave the estate credit for the proceeds of all the cotton. But when he paid to the negroes their share of the money, viz : the sum of $143 97, he debited the estate therewith by way of crosst entry. It is to that sum, as a credit to the plaintiff in his account current, that the present exception is taken.
 

 The court is of opinion, that the exception should be overruled. The practice of the testator, as a'master, and the conduct of the plaintiff; as executor, conform to the usage, and a most beneficial usage, which is almost universal throughout North
 
 *564
 
 Carolina; and we have never knownor heard of an attempt hitherto, to charge an executor in favor of a legatee or even creditor, with the little crops of cotton, corn, potatoes, ground peas and the like, made by slaves by permission of their deceased owners, Executors are not chargeable with anything but that which they ought to have received; and it has never been considered that the negro’s little crops, growing or made, were assets, any more than the little sums of money which they might have received for the crop of the preceding year, if any remnant were left in their chests, or their poultry, or their dog, or their extra clothing, Those petty gains and properties have been allowed to our servants by usage, and may be justified by policy and law, upon the same principle, that the savings of a wife in housekeeping, by sales of milk, butter, cheese, vegetables and so forth, are declared to be, by the husband’s consent the property of the wife. It is true a slave cannot have property ; and upon that the- argument for the exception is built. But it is equally true that a married woman can have no property in money or personal chattels in possession ; but they belong in strict law to the husband, and actions in respect to them must be in the husband’s name. Nevertheless, the wife may claim them against the executor. Now we do not say, that negroes can hold any thing against the executor, because they and what they have belong, as property, to the executor. But we do say, that an executor is not bound to strip a poor negro of the things his master gave him, nor to take away his petty profits from a patch, with the proceeds of which the slave, with the ordinary precaution Of a prudent and humane master, may be induced, and in a measure compelled, to buy those needful comforts of food and raiment, over and above thp allowances of the owner, which promote his health, cheerfqlne.ss and contentment, and enhance his value. In many instances, what the slave, with a pride that makes him happy, buys for himself, would, if not thus procured, be of necessity supplied directly by the master; so that, in point of fact, leaving to the negro the spending of his m°ney at his own pleasure, is .then a pecuniary saving to the estate; and these slight
 
 *565
 
 indulgencies arc repaid by the attachment of the slave to master and his family, by exerting his industry and honesty,' and a spirit to make and save for the master as well as for himself. In fine, experience has proved so fully the advantages of these minor benefactions to a dependent race, which humanity at first prompted, that there is scarcely an owner slaves, who does not act as this testator did, and no executor we believe, ever acted otherwise in such a case, than the plaintiff did. Of course it will be understood, that we cannot intend to shield a person, whether he be master or executor, in a case of
 
 mala fides
 
 in attempting to cover property from creditors or legatees under the pretence that it belongs to the slaves. Like paraphernalia, beyond the party’s circumstances, it would be disallowed. But there is no suggestion that the plaintiff did not act
 
 bona fide ;
 
 the only argument being, that he was obliged to take whatever the negroes had, be that little or much. We do not think so, for the reason given. Indeed, there are a number of statutes, which in regulating trading with slaves, recognize a sort of ownership by slaves of certain articles, by permission of the master, forbidding them to have certain other articles or to sell or buy them; which shewSj that there is an universal sense pervading the whole community, of the utility, nay, unavoidable necessity, of leaving to the slave some small perquisites, which may be called his and disposed of by him as his, although as against a wrong doer the property must be laid in the master, for the sake of the remedy, and although the master, if he will, may take all__ Here the sums received by the negroes were but a pittance
 
 per capita;
 
 not more probably, than the ducks, chickens and eggs of the same number of slaves would have brought, nor half as much as their Sunday finery would. The exception prefers an ungracious claim, andas we think an unfounded one; and it must be overruled.
 

 The second exception is, that the commissioners have allowed all the commissions to the plaintiff, whereas Mrs. Parsons is entitled to a part of them. The answer to that is, that the account before us is not one of the whole estate, but only
 
 *566
 
 the administration of that part, which come to the hands °f l*le It does not appear, that the executrix had any thing whatever to do witii the transactions embraced in £^£3 accounti When her administration accounts come to be taken, she will be allowed such commissions, as may be proper, on what she received and disbursed. This exception is also overruled.
 

 A third exception is to a credit allpwed the plaintiff for the sum of $1,306 25 paid on a bond given by the testator to one Asa Hubbard. The facts in relation to the debt in question appear in the evidence to be as follows. A purchase was made by the testator from Hubbard of a house and lot in Wades-borough at a price exceeding $3,000; which purchase was for the benefit of the plaintiff Waddill, who occupied it as a tavern. The testator gave his bonds for the purchase money, and, on the 25th of April 1832, he made his will, and, after giving his daughter Mrs. Waddill a tract of land and some slaves, adds thus; “If Thomas Waddill pays for the hoüse and lot I bought of A. Hubbard and has no account against my estate, then I also give said house and lot to my daughter Eleanor Waddill, including all the furniture.” Afterwards the plaintiff paid Asa Hubbard the purchase money of the house and lot, except a sum, which with the interest amounted, at the time of payment, after the testator’s death to $1,306 25: and the testator made a codicil to his will May 1st. 1836, and therein devised thus“Instead of leaving the tavern house and lot in Wadesborough to my daughter Eleanor, I leave it to my son in law, Thomas Waddill — provided he has no accounts against my estate.” It is very clear from the evidence, that the purchase of the house was for Waddill; but as the testator was to be bound for the purchase money as surety for Waddill, he preferred giving his own bonds for the price and taking the deed to himself, as his security. The debt therefore was really Waddill’s; and so he treated it, up to the testator’s death, by making the payments instead of the testator. Hence, probably, upon some understanding between those parties, the devise of the house and lot was to Waddill’s
 
 *567
 
 wife on condition of the payment by him of the whole of the purchase money. It is said, however, that the condition is dropped in the disposition to Waddill himself in the codicil. But that is not so. It is not indeed expressly repeated, but it is virtually; for the codicil leaves the property to him “instead of leaving it to his wife.” That is, it merely substitutes the husband for the wife ; and, consequently upon the same terms, of paying the purchase money. The testator did not mean to give more by the codicil than by the will, but onl y to change the devisee. The payment of the residue of the purchase money, which was unpaid at the death of the testator, was incumbent upon the plaintiff himself, and he had no right to charge the estate with it. The third exception is therefore allowed.
 

 In the account the plaintiff charges the estate with the sum of $40, “ advanced to Mrs. Martin, and also with the sum of fill 79, Thomas Waddill’s account.” To these two items, the defendants take a fourth exception, because they, are not supported by any evidence. And such being the fact, this exception is also allowed.
 

 Per Curiam, Directions to the master given accordingly.